NOT RECOMMENDED FOR PUBLICATION
File Name: 19a0200n.06

No. 18-3119

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

JEFFREY SAUNDERS,

    Plaintiff-Appellee,

v.

CUYAHOGA METROPOLITAN HOUSING
AUTHORITY, et al.,

    Defendants

OFFICER HARUN ABDUL-ALI,

    Defendant-Appellant.

)
)
)
)
)
)
)
)
)
)
)
)
)
)

**FILED**
Apr 23, 2019
DEBORAH S. HUNT, Clerk

ON APPEAL FROM THE
UNITED STATES DISTRICT
COURT FOR THE
NORTHERN DISTRICT OF
OHIO

BEFORE: SILER, SUTTON, and WHITE, Circuit Judges.

HELENE N. WHITE, Circuit Judge.

Defendant-Appellant Officer Harun Abdul-Ali (Officer Ali) appeals the district court's

denial of his motion for summary judgment based on qualified immunity in this action arising from

his use of a taser and pepper spray on Plaintiff-Appellee Jeffrey Saunders (Saunders). We affirm.

I.      BACKGROUND[1]

Officer Ali is a police officer for the Cuyahoga Metropolitan Housing Authority Police

Department (CMHA PD). During the afternoon of January 20, 2014, he was dispatched to Unit

---

[1] In considering Officer Ali's motion for summary judgment, the district court was required to view the
evidence and draw all reasonable factual inferences in favor of Saunders. Accordingly, we recite Saunders's version
of the facts, except where otherwise noted.

612 of an apartment complex to respond to a noise complaint. Saunders, a custodian at the apartment complex, was inside Unit 612 delivering a soda to the tenant's sister, Jamila Williams (Williams), when Officer Ali arrived. There was no music playing, nor was the TV on. When Saunders opened the door, Officer Ali asked where the leaseholder was. Saunders identified himself as the custodian of the apartment complex, told Officer Ali that the leaseholder was not in the apartment, and asked what was going on. Officer Ali then asked to enter the apartment, which Williams and Saunders allowed, and requested identification from Williams and Saunders. Williams did not have identification but provided Officer Ali with identifying information and informed Officer Ali that she was the leaseholder's sister. As Williams was providing Officer Ali her information, Saunders attempted to show his driver's license to Officer Ali, who gestured for Saunders to wait. Saunders tried again, but again Officer Ali motioned for him to wait, so Saunders put his driver's license back into his jacket.

Once Officer Ali finished with Williams, he turned to Saunders, cracked his knuckles and rolled his head around—"as if he was preparing for combat"—and asked for Saunders's identification. (R. 61 at 162, 166.) Saunders asked why Officer Ali was trying to intimidate him, and Officer Ali responded that he was going to call his supervisor. Saunders then placed his hands in his pockets while waiting for Officer Ali's supervisor to arrive. Officer Ali told Saunders to remove his hands from his pockets and to come towards him. Saunders responded by placing his hands in the air. Saunders did not move toward Officer Ali because "[a]fter [Officer Ali was] cracking his knuckles and rolling his head around, the way his aggression was going on, I didn't need to have anything to do with Officer Ali at that time." (R. 61 at 164, 199.) He said to Officer Ali, "I am not going to come over there towards you[;] I don't need to come over there towards you, Officer." (*Id.* at 199.) According to the dispatch log, Officer Ali reported a "male claiming

to be maintenance refusing to show ID," and, three minutes later, a "male refusing to give ID and take his hands out of his pockets." (R. 62-5, PID 1093, 1097-1098.)

Saunders was standing in the entryway by the door, looking down. When he looked up, Officer Ali was holding his taser. Saunders asked, "Well what are you going to do with that?" (R. 61 at 178.) Officer Ali gave no additional commands. Saunders decided to put his hands down and turn around to open the door; when he did, Officer Ali deployed his taser, striking Saunders in the right shoulder and lower waist of his jacket. The taser had no impact on Saunders, however, likely because he was wearing a thick jacket. Saunders proceeded into the hallway with Officer Ali following and deploying his taser. Officer Ali did not command Saunders to stop. As Saunders was walking through the hallway, Officer Ali pulled out his pepper spray and began spraying it at Saunders. Saunders called for help and knocked on neighbors' doors before being allowed inside Unit 616 by the tenant, Hoover Wilson (Wilson).

Officer Ali asked for permission to enter Wilson's apartment but was denied. A few minutes later, without commanding him to exit the unit, two other officers, Officer Reynolds and Officer Collins, entered Wilson's unit and approached Saunders. Saunders put his hands out and was handcuffed. At that point, Officer Ali entered the apartment and drive stunned Saunders with his taser.[2] Saunders asked, "Why is he tasering me?" (*Id.* at 213.) Officer Reynolds then instructed Officer Ali to "[s]uspend tasing." (*Id.*) The officers pulled Saunders out of Wilson's apartment and laid him face down on the carpet in front of Wilson's door. Although Saunders was not resisting, Officer Ali drive stunned Saunders several more times while the officers were giving

---

[2] Sergeant James Neal stated in his declaration that "[a] drive stun is a secondary function of the taser that delivers an isolated shock, similar to a bee sting, where the taser contacts the body. A drive stun does not incapacitate a suspect but is for pain compliance." (R. 62-5, PID 1093-94.) Saunders testified that the drive stuns he received were not like a bee sting; rather, he felt like he was being shocked, and they caused him to jolt.

commands and Saunders was saying, "You got me cuffed, you got me cuffed. Please tell him to stop. Please tell him to stop." (*Id.* at 214, 229-34.)

A video recorded a twenty-five-second span near the end of this encounter. The video shows four officers in a hallway. Two of the officers are bending down, and two are standing. The officers are tending to Saunders, who is on the ground and not visible in the video. The officers are talking, but it is not clear what they are saying. What is clear is Saunders screaming, "You got me cuffed. You got me cuffed. Please tell him to stop it." One of the officers then calmly tells Saunders to "roll on your side, facing me. Roll on your side." Saunders replies frantically, "Which way, left or right?" and states that he works in the building as a custodian. An officer then says in a louder voice, "Relax." Saunders responds, "I've been relaxed." An officer then yells, "Hands down, head down." The video cuts off shortly thereafter.

CMHA PD ran a report on Officer Ali's taser, which indicated that Officer Ali fired his taser thirteen times. Eight firings occurred within forty-six seconds; four minutes later, five firings occurred within one minute and eighteen seconds.

Saunders was charged with assault, burglary, and obstructing official business. The burglary charge was dismissed, and Saunders was found not guilty of assault, but guilty of obstructing official business. That conviction was reversed on appeal because "the trial court [] committed reversible error by failing to conduct a *Batson* hearing and allowing the state to explain its non-racial reasons for removing an African-American juror." *State v. Saunders*, 58 N.E.3d 470, 475 (Ohio Ct. App. 2016). After remand, Saunders pleaded guilty to a misdemeanor charge of disorderly conduct in violation of Ohio Revised Code § 2917.11(A)(2).[3]

---

[3] Ohio Revised Code § 2917.11(A)(2) provides: "No person shall recklessly cause inconvenience, annoyance, or alarm to another by . . . [m]aking unreasonable noise or an offensively coarse utterance, gesture, or display or communicating unwarranted and grossly abusive language to any person." Saunders pleaded to a specification that

Saunders brought this action against Officer Ali and CMHA, alleging excessive force against Officer Ali in his individual and official capacity, failure to train and/or supervise under 42 U.S.C. § 1983 against CMHA, and negligent training and supervision against CMHA. Both Defendants filed motions for summary judgment. The district court granted summary judgment to CMHA and to Officer Ali for the claim against him in his official capacity, but denied summary judgment to Officer Ali on the excessive-force claim brought against him in his individual capacity. The district court reasoned in part that Officer Ali is not entitled to qualified immunity because, accepting Saunders's version of events, "a reasonable jury could conclude that Officer Ali violated Plaintiff's right to be free from the use of excessive force, and that the right was clearly established as of January 20, 2014." (R. 89, PID 1473-1505.) This appeal followed.

## II. DISCUSSION

### A. Jurisdiction

The court's jurisdiction of this appeal is limited to issues of law. *Stoudemire v. Mich. Dep't of Corr.*, 705 F.3d 560, 564 (6th Cir. 2013). "A defendant raising a qualified immunity defense 'may not appeal a district court's summary judgment order insofar as that order determines whether or not the pretrial record sets forth a "genuine" issue of fact for trial.'" *Kennedy v. City of Cincinnati*, 595 F.3d 327, 333 (6th Cir. 2010) (quoting *Johnson v. Jones*, 515 U.S. 304, 319-20 (1995)).

Saunders initially raises a jurisdictional challenge to Officer Ali's appeal. He points out that Officer Ali's brief recites at length facts that flatly contradict Saunders's version of events and argues that Officer Ali's appeal must be dismissed because he failed to concede the most favorable

---

he "persisted in the disorderly conduct after reasonable warning or a request to desist." (R. 62-6, PID 1104.) There is nothing in the record to indicate at what point in his interaction with Officer Ali Saunders engaged in disorderly conduct and, as the district court held and Officer Ali does not challenge on appeal, the elements of this misdemeanor do not necessarily constitute active resistance.

view of the facts for purposes of this appeal. "Language in our earlier decisions interpreting *Johnson* [*v. Jones*, 515 U.S. 304 (1995)] suggests that where, as here, the appellant fails to concede the facts as alleged by the appellee, this court is completely deprived of jurisdiction over the appellant's interlocutory appeal." *Livermore ex rel. Rohm v. Lubelan*, 476 F.3d 397, 403 (6th Cir. 2007) (citing *Berryman v. Rieger*, 150 F.3d 561, 563 (6th Cir. 1998)). However, our later cases rejected that approach. *See Estate of Carter v. City of Detroit*, 408 F.3d 305, 310 (6th Cir. 2005) ("If, however, aside from the impermissible arguments regarding disputes of fact, the defendant also raises the purely legal question of whether the facts alleged support a claim of violation of clearly established law, then there is an issue over which this court has jurisdiction." (internal quotation marks, citations, and alterations omitted)). This court will ignore the defendant's failure to accept the facts in the light most favorable to the plaintiff and resolve the legal issue. *Id.* (citing *Phelps v. Coy*, 286 F.3d 295, 298-99 (6th Cir. 2002); *Beard v. Whitmore Lake Sch. Dist.*, 402 F.3d 598, 602 n.5 (6th Cir. 2005)); *see also Kennedy*, 595 F.3d at 334; *Livermore ex rel. Rohm*, 476 F.3d at 403.

In any event, Officer Ali clarified in his Reply Brief "that the Court can and should accept the Plaintiff's record-supported allegations as true to the extent that they are properly supported by competent evidence in the record," but he is also requesting that we "take into account certain admissions made by Saunders at his deposition and to consider other evidence in the record that was not disputed or contradicted by Plaintiff's deposition or affidavit" as well as the video evidence. (Reply Br. at 3-4.) This approach is supported by our caselaw. *See Thomas v. City of Eastpointe*, 715 F. App'x 458, 460 (6th Cir. 2017) ("And if any of those facts are disputed, we look first to the dash-cam recording." (citing *Rudlaff v. Gillispie*, 791 F.3d 638, 639 (6th Cir. 2015))); *Chappell v. City of Cleveland*, 585 F.3d 901, 910-12 (6th Cir. 2009) (considering the

officers' testimony that was not "refuted by physical or circumstantial evidence" or "disputed by contrary testimony" even though the officers' testimony was not included in the district court opinion).

Accordingly, we have jurisdiction to consider the legal issue whether Officer Ali is entitled to qualified immunity, considering the disputed evidence in the light most favorable to Saunders as well as the video evidence and other undisputed evidence.

## B. Qualified Immunity

"The qualified immunity doctrine protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Goodwin v. City of Painesville*, 781 F.3d 314, 320–21 (6th Cir. 2015) (internal quotation marks omitted) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). To determine whether Officer Ali is entitled to qualified immunity on Saunders's excessive-force claim, the court analyzes "(1) whether the officer violated the plaintiff's constitutional rights under the Fourth Amendment; and (2) whether that constitutional right was clearly established at the time of the incident." *Kent v. Oakland County*, 810 F.3d 384, 390 (6th Cir. 2016) (citing *Hagans v. Franklin Cty. Sheriff's Office*, 695 F.3d 505, 508 (6th Cir. 2012)).

In determining whether a right is clearly established, the Supreme Court has repeatedly cautioned courts "not to define clearly established law at a high level of generality." *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (internal quotation marks and citation omitted). "Although [the Supreme] Court's caselaw does not require a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* (internal quotation marks and citation omitted). However, "[i]f it defeats the

qualified-immunity analysis to define the right too broadly (as the right to be free of excessive force), it defeats the purpose of § 1983 to define the right too narrowly (as the right to be free of needless assaults by left-handed police officers during Tuesday siestas)." *Kent*, 810 F.3d at 396 (internal quotation marks omitted) (quoting *Hagans*, 695 F.3d at 508-09).

### 1. Excessive Force

Officer Ali argues that the district court applied the wrong legal standard and erroneously denied him qualified immunity. Although Officer Ali's brief focuses on the second prong of the analysis—whether he violated any clearly established right—he does briefly dispute the district court's finding that he used excessive force. Officer Ali argues that "the undisputed evidence in the record shows that Saunders was engaged in criminal conduct, that he presented a danger after he refused to show identification and comply with Officer Ali's commands, and that he resisted and attempted to evade arrest by fleeing from Officer Ali." (Appellant's Br. at 28-29.) In a footnote, Officer Ali elaborates that he had been called to the same location—it is unclear if he is referring to the same unit or just the same apartment complex—a week earlier in response to a report of alleged drug activity, a fact that he did not mention to the district court. He argues that the combination of this previous report of drug activity, the fact that neither occupant was a leaseholder, and Saunders's defiance, could reasonably lead Officer Ali to believe that Saunders was engaged in criminal activity and could be armed and dangerous.

The determination whether Officers Ali's actions constitute excessive force in violation of the Fourth Amendment "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham v. Connor*, 490 U.S. 386, 396 (1989) (citing *Tennessee v. Garner*,

471 U.S. 1, 8-9 (1985)). "The inquiry assesses 'reasonableness at the moment' of the use of force, as 'judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'" *Goodwin*, 781 F.3d at 321 (quoting *Graham*, 490 U.S. at 396).

We agree with the district court that the first *Graham* factor—the severity of the crime at issue—weighs in favor of Saunders because Officer Ali was called to the apartment for a mere noise complaint, and the disorderly conduct charge to which Saunders eventually pleaded guilty does not qualify as a serious crime. *See Goodwin*, 781 F.3d at 322 (noting that a jury could conclude that disorderly conduct is not a violent or serious crime for the purpose of effectuating an arrest). Officer Ali's belated attempt to point to a previous report of drug activity does not change the analysis because there is nothing in the record suggesting that drug activity occurred or that it involved Saunders or Unit 612. Further, as the district court reasoned, although Saunders was initially charged with obstruction of official business, burglary, and assault, "nothing about the unsuccessful attempts to pursue convictions against Plaintiff for those three crimes forecloses a jury from finding that a reasonable officer at the time of the incident would not have considered Plaintiff to be engaged in 'severe' criminal activity." (R. 89, PID 1489 (citation omitted).)

The district court also found that the second *Graham* factor, asking whether Saunders posed an immediate threat to the safety of the officers or others, favors Saunders:

> Plaintiff alleges that he attempted, several times, to offer his identification to Officer Ali, but Officer Ali repeatedly indicated for Plaintiff to wait. Later, when Officer Ali exhibited behaviors "as if he was preparing for combat," Plaintiff asked what was going on. While Officer Ali called his supervisor, Plaintiff stood against the wall by the door with his hands in his coat pockets and his eyes down. At some point shortly thereafter, when Plaintiff looked back up, Officer Ali had drawn his taser. Confused, Plaintiff turned to move into the hall as Officer Ali fired. Officer Ali followed closely behind with pepper spray. Plaintiff then moved down the hallway calling out for help before eventually asking to wash his eyes off in Mr. Wilson's apartment, Unit 616. Plaintiff also indicates that once the two other CMHA officers entered Mr. Wilson's apartment to arrest him, Plaintiff placed his arms out in front of him so that his hands could be handcuffed. Finally, the partial

> video depicts Plaintiff asking CMHA officers questions about their orders while he was on the ground outside of Mr. Wilson's apartment being arrested. The video also depicts Plaintiff asking the two other CMHA officers to stop Officer Ali from tasering him since he was already handcuffed. On the basis of these facts, a jury could conclude that a reasonable officer in Officer Ali's position would not have taken Plaintiff's actions to pose an immediate threat to anyone's safety.

(R. 89, PID 1489-90 (internal citations omitted).) We agree with the district court's reasoning.

Finally, the third *Graham* factor—whether Saunders was actively resisting arrest or attempting to evade arrest by flight—also supports a finding of excessive force. As an initial matter, it is undisputed that Saunders identified himself as the custodian of the building. Thus, this was not a situation where Officer Ali needed to apprehend Saunders for a minor (if any) crime at that moment or risk losing him forever, which weighs against using a taser or pepper spray to apprehend the suspect.

Further, as the district court noted, Officer Ali never told Saunders that he was under arrest while he was in Unit 612 or in the hallway, and Saunders's testimony—which the video evidence does not definitively contradict—indicates that he was not actively resisting arrest while Officer Ali continued to tase Saunders after he had been handcuffed. Although Officer Ali argues that Saunders was attempting to flee when Saunders left Unit 612, accepting Saunders's testimony as true, Officer Ali never told Saunders that he was under arrest or to stop, Saunders had not even begun to walk away when he was initially tased, and he walked away after he was tased to ask for help from neighbors.

Because each of the three *Graham* factors weighs in favor of Saunders, Officer Ali's use of force was objectively unreasonable. *See Grawey v. Drury*, 567 F.3d 302, 311 (6th Cir. 2009) ("An officer has used excessive force when he pepper sprays a suspect who has not been told she is under arrest and is not resisting arrest."); *Atkins v. Twp. of Flint*, 94 F. App'x 342, 349 (6th Cir. 2004) (denying qualified immunity where officer twice sprayed and three times hit the arrestee

with a baton without "inform[ing] [the] suspect either that he was being arrested where the charge is making a 911 call for an improper purpose, or, at least, that making an improper 911 call is a crime"); *Adams v. Metiva*, 31 F.3d 375, 385 (6th Cir. 1994) ("In regard to the third factor, whether plaintiff was actively resisting arrest or attempting to evade arrest is contested as plaintiff alleges he was never told he was under arrest or why he was being further detained after submitting to two pat-down searches. Moreover, plaintiff's alleged flight was an announced walking to his friend's house across the street. . . . In the present case, there was ample time for Metiva to inform plaintiff that he wanted to cite plaintiff for a seat belt infraction, and that if he had no identification, he had to provide Metiva with the necessary information and could not leave until he did so.").

## 2. Clearly Established

Consistent with our analysis above, a reasonable jury could also find that Officer Ali violated Saunders's clearly established right to be free from excessive force when he tased or pepper sprayed Saunders while Saunders was not resisting arrest. *See Hagans*, 695 F.3d at 509-10; *see also Kent*, 810 F.3d at 392 (summarizing earlier case law as drawing this line: "When a suspect actively resists arrest, the police can use a taser [ ] to subdue him; but when a suspect does not resist, or has stopped resisting, they cannot." (alteration in original) (quoting *Rudlaff*, 791 F.3d at 642)). Accordingly, we affirm the district court's denial of qualified immunity.

### III.    CONCLUSION

For the reasons set out above, we affirm the district court's decision.