McKEAGUE, J., delivered the opinion of the court in which MATTICE, D.J., joined, and DONALD, J., joined in the result. DONALD, J. (pp. 644-48), delivered a separate opinion concurring in the judgment.
OPINION
McKEAGUE, Circuit Judge.
Two county police officers used force (one, a knee strike; the other, a taser) to subdue Lawrence Carpenter during his arrest. Their dash-cam videos show, and Carpenter admits, that he resisted arrest and refused to be handcuffed before the officers used force. When an arrestee actively resists arrest like Carpenter did, the police can constitutionally use a taser or a knee strike to subdue him. Because the officers did no more than that here, they acted within the bounds of the Fourth Amendment. We accordingly reverse the district court’s denial of summary judgment to the officers.
I
Before filling in the facts, let us be clear on how we view them. Ordinarily in summary-judgment appeals involving qualified immunity (like this one), we view the facts in the light most favorable to the plaintiff. Scott v. Harris, 550 U.S. 372, 378, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007). But there is “an added wrinkle in this case: existence in the record of [two] videotape[s] capturing the events in question.” Id. In such a case — “where the police dash-cam video[s] ... depict[ ] all of the genuinely disputed facts,” Standifer v. Lacon, 587 Fed.Appx. 919, 920 (6th Cir.2014) — we “view[] the facts in the light depicted by the videotape[s].” Scott, 550 U.S. at 381, 127 S.Ct. 1769.
Here are the facts, then, according to the two dash-cam videos and filled in by the record taken in the plaintiffs favor. As Deputy Brandon Gillispie drove along Route 55 in Wellston, Michigan on routine afternoon patrol, he observed Lawrence Carpenter’s truck going the other way. Gillispie knew Carpenter from three prior encounters, all involving Carpenter driving with a suspended license. In the last of *640 these encounters, Carpenter took off running after being pulled over by Gillispie. Gillispie also knew Carpenter’s history of drunk driving and getting physical with police,officers after being stopped. Thus, when Gillispie saw Carpenter driving on this occasion, he knew Carpenter was violating the law because he was (at least) driving with a suspended license, and he was on high alert because of Carpenter’s history with the police.
Gillispie accordingly made a U-turn, turned on his lights, and pulled Carpenter over to arrest him — in an undisputed lawful stop. Gillispie called another officer, Deputy Jacob Bielski, for backup and informed Bielski of Carpenter’s history of aggression toward the police. Bielski, who was only seconds away, pulled over behind Gillispie and Carpenter. The three cars parked on the narrow shoulder of the two-lane, 55-mile-per-hour highway. Both officers’ dash-cam videos recorded the events that followed.
Gillispie approached Carpenter’s truck and informed him through his open window that he was under arrest for driving with a suspended license. R. 28-1 (Carpenter Dep.) at 14. Gillispie then opened the driver’s side door and told Carpenter to get out. According to Gillispie, Carpenter appeared “highly agitated” and was “swearing” in response to this request, but he voluntarily exited the truck. R. 28-2 (Gillispie Dep.) at 7. The videos and depositions confirm that Carpenter appeared agitated, as he puffed out his chest and stared down Gillispie as he left the vehicle. Gillispie instructed Carpenter to put his hands- on the truck. But Carpenter did not listen to Gillispie’s instructions. Gillis-pie then grabbed Carpenter’s right arm and tried to move it onto the truck. Carpenter swung (or “jerked,” if you’d prefer, Concurring Op. at 646-47) his arm back in Gillispie’s direction — admittedly trying to “prevent [Gillispie] from handcuffing” him. R. 28-1 at 15.
After the swing, Gillispie succeeded in getting Carpenter to put both hands on the truck and attempted to grab Carpenter’s left arm to place it in handcuffs. At this, Carpenter swung his arm in Gillispie’s direction for the second time, again trying to resist being handcuffed. See R. 28-1 at 15. The audio in one of the dash-cam videos picked up Gillispie at least twice telling Carpenter to “give me the hands.” R. 30 (Bielski Dash-Cam Video) at 13:18:46-50. But Carpenter still would not comply. He testified that he instead just “ball[ed] up” because Gillispie had “kept tugging on me,” and that he would have complied if Gillispie would have let him go. R. 28-1 at 19.
Yet Gillispie did not let go, and Carpenter did not comply. Gillispie performed a knee strike • on Carpenter, attempting to force his compliance. But the knee strike did not succeed in subduing Carpenter, who still appeared to be struggling. R. 30 (Gillispie Dash-Cam Video) at 13:17:43-51. Deputy Bielski, who had observed all of this — from the puffed-up chest, to the two arm swings, to Carpenter’s balling up, to the ineffective knee .strike — yelled at Carpenter to “relax, or else you’re gonna get tasered.” R. 30 (Bielski Dash-Cam Video) at 13:13:50-51. (Bielski does not remember giving this warning, see R. 28-3 at 7, but it is clear from the video.) Carpenter testified that he didn’t “pay [] attention” to this warning. R. 28-1 at 16. Moments later, Bielski tased Carpenter, who almost immediately fell to the ground. The officers handcuffed him, assisted him to his feet, and escorted him to the police cruiser. They did not use any force after they subdued Carpenter, who later pled guilty to driving with a suspended license.
Carpenter sued the officers, claiming they used excessive force in violation of *641 the Fourth (and Fourteenth) Amendment. He contends that both Gillispie’s knee strike and Bielski’s taser shot were excessive, but his briefing treats the two types of force alike. We do the same. (Carpenter has since passed away from causes unrelated to this case. His estate’s personal representative, Scott Rudlaff, has taken over the case, but we still refer to the plaintiff as Carpenter.) The officers, believing qualified immunity insulates them from this suit, sought summary judgment before the district court. But citing “disputed issues of material fact,” the district court denied the motion, even though it noted that the “case do[es] not fall neatly into” categories of clearly established law. R. 32 at 1, 7, 9.
The officers appealed. We have jurisdiction to hear the appeal under the collateral-order doctrine. Mitchell v. Forsyth, 472 U.S. 511, 530, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985). Contrary to Carpenter’s contention, Johnson v. Jones, 515 U.S. 304, 319-20, 115 S.Ct. 2151, 132 L.Ed.2d 238 (1995), does not stand in the way because the officers do not “solely contest the plaintiffs account of the facts.” Family Serv. Ass’n ex rel. Coil v. Wells Twp., 783 F.3d 600, 607 (6th Cir.2015). They accept the record taken in the videos’ and plaintiffs light and raise a pure question of law: whether their conduct violated the Fourth Amendment and, if so, whether it violated clearly established law. Plumhoff v. Rickard, — U.S. -, 134 S.Ct. 2012, 2019, 188 L.Ed.2d 1056 (2014); see Scott, 550 U.S. at 378-81, 127 S.Ct. 1769.
II
We begin with some general propositions of law. The police must act reasonably when seizing a person. See U.S. CONST. amends. IV & XIV. Using “excessive force” during an arrest is unreasonable and thus violates the Fourth Amendment. Graham v. Connor, 490 U.S. 386, 394-95, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). But a police officer who uses excessive force can be held personally liable only if the use of force was clearly established as excessive at the time of the arrest. Pearson v. Callahan, 555 U.S. 223, 231, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009). That means existing caselaw must clearly and specifically hold that what the officer did — under the circumstances the officer did it — violated the Constitution. We therefore must determine (A) whether the officers’ conduct violated the Constitution; and (B) if so, whether it violated law that has been clearly established.
A
Prong One. Our cases firmly establish that it is not excessive force for the police to tase someone (even multiple times) when the person is actively resisting arrest. Hagans v. Franklin Cnty. Sheriffs Office, 695 F.3d 505, 509 (6th Cir.2012); e.g., Williams v. Sandel, 433 Fed.Appx. 353, 363 (6th Cir.2011) (not excessive force to tase the suspect thirty-seven times (and use batons and pepper spray) because he actively resisted arrest). Active resistance includes “physically struggling with, threatening, or disobeying officers.” Cockrell v. City of Cincinnati 468 Fed.Appx. 491, 495 (6th Cir.2012) (collecting cases). And it includes refusing to move your hands for the police to handcuff you, at least if that inaction is coupled with other acts of defiance. Caie v. W. Bloomfield Twp., 485 Fed.Appx. 92, 94, 96-97 (6th Cir.2012); see Williams v. Ingham, 373 Fed.Appx. 542, 548 (6th Cir.2010). But active resistance does not include being “compliant or hav[ing] stopped resisting,” Hagans, 695 F.3d at 509; or having “done nothing to resist arrest,” or having “already [been] detained,” Cockrell, 468 Fed.Appx. at 496 (collecting cases). E.g., *642 Eldridge v. City of Warren, 533 Fed.Appx. 529, 535 (6th Cir.2013) (excessive force to tase someone whose “noncompliance was not paired with any signs of verbal hostility or physical resistance”); Griffith v. Coburn, 473 F.3d 650, 658 (6th Cir.2007) (excessive force for an officer who, if the plaintiff was believed, “almost immediately and without provocation” began choking the suspect). A simple dichotomy thus emerges: When a suspect actively resists arrest, the police can use a taser (or a knee strike) to subdue him; but when a suspect does not resist, or has stopped resisting, they cannot.
Based on the record and law before us, the officers did not violate Carpenter’s constitutional rights when they used force to subdue him. No matter how you cut it, Carpenter actively resisted arrest. There is no genuine dispute of fact on this point. Carpenter never denies being verbally defiant, and in fact admits that he “told [Deputy Gillispie that he] wasn’t going to” comply. R. 28-1 at 18. He puffed his chest and stared down Gillispie. He twice swung his arms in the officer’s direction. He locked up his body (“ball[ed] up”) and admittedly refused to give Gillispie his hands. And, pivotally, he admitted at his deposition that he tried to prevent Gillispie from handcuffing him — ie., he conceded that he resisted arrest. R. 28-1 at 15; see Oral Argument at 17:41-18:03. (And yes, words, including Carpenter’s own words, do have power. Concurring Op. at 644.) A reasonable police officer observing this scene in the heat of the moment did not need to give Carpenter any more time to comply before tasing him. Because Carpenter “actively resisted] arrest and re-fus[ed] to be handcuffed,” Hagans, 695 F.3d at 509, a reasonable jury applying the law of our circuit could conclude only that the officers were constitutionally able to use the force they did to subdue him. Id.
Carpenter’s version of the facts does not change this conclusion. His story — that he was “jerked [ ] out of the truck,” R. 28-1 at 15, and that he “attempt[ed] to comply with Gillispie’s commands when Bielski deployed the taser without warning,” Appel-lee Br. 16 — amounts to a “visible fiction” in light of the dash-cam videos and his own admissions. Scott, 550 U.S. at 381, 127 S.Ct. 1769. His purported subjective intent to comply with the officers’ requests fares no better, for we view his actions objectively, from the perspective of a reasonable officer at the scene. Chappell v. City Of Cleveland, 585 F.3d 901, 912 (6th Cir.2009). From that perspective, Carpenter “strongly indicated his intentions were not innocent and compliant, but defiant and hostile.” Id.
The cases Carpenter cites also fail to change our conclusion. Simply, they do not involve suspects who actively resisted arrest. E.g., Correa v. Simone, 528 Fed.Appx. 531, 534 (6th Cir.2013) (“[A]t the time [the officer] used the taser, [the suspect’s] hands were in the air and he was not resisting.”); Landis v. Baker, 297 Fed.Appx. 453, 461 (6th Cir.2008) (When the officers tased the suspect four times in a span of several seconds, they had already pinned him down by using “at least ten strikes of a police baton,” even though “he was not actively resisting arrest or posing a threat to anyone in the vicinity.”). Carpenter’s self-proclaimed best case, Parker v. Gerrish, 547 F.3d 1 (1st Cir.2008), is no different: The suspect there “complied with [the officer’s] requests and gave himself up for arrest” by “voluntarily releasing] his hands” before the officers tased him. Id. at 9, 11. (It’s also a First, not Sixth, Circuit case; the officer waived his qualified-immunity defense, id. at 13; the suspect did not initially know that he was under arrest; and the court reviewed a jury verdict, not a motion for summary *643 judgment.) But even granting Carpenter’s generous reading of Parker, Appellee Br. 18-22, we, no less these officers, follow the precedent from this circuit: that police officers can tase someone who resists lawful arrest and refuses to move his hands so the police can handcuff him. Hagans, 695 F.3d at 509 (collecting cases). That’s all the officers did here.
Nor, finally, will we read a de minimis resistance exception into the Fourth Amendment, as Carpenter and the concurrence would have us do. This exception would presumably prohibit the police from using force if a jury decided that the suspect only kind of resisted arrest. See Concurring Op. at 646-47. No, plain and simple: When a person resists arrest-say, by swinging his arms in the officer’s direction, balling up, and refusing to comply with verbal commands — the officers can use the amount of force necessary to ensure submission. A de minimus rule— say, that the arrestee’s arm swing needs to make direct contact with the officer, see Appellee Br. 16, Oral Argument at 19:06-19:08 (Carpenter’s suggestion), or that the officers need to let the suspect resist for longer than thirty seconds before taking action (one minute? Two? Three ?), see id. at 4:09-4:30 (the concurrence’s suggestion) — does not provide the necessary guidance for the police, and it risks the safety of all involved. Plus, this de mini-mus rule does not align with our caselaw, which has allowed force when the arrestee resisted less than Carpenter did here. E.g., Caie, 485 Fed.Appx. at 96-97 (force allowed because the arrestee did not give up his hands.for arrest, even though he was taken down and “arguably ‘subdued’ ”). Mindful as we are that the “calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments [] in circumstances that are tense, uncertain, and rapidly evolving,” Graham, 490 U.S. at 396-97, 109 S.Ct. 1865, we hold that because Carpenter actively resisted arrest, the one-time taser shot and knee strike to subdue him did not violate the Fourth Amendment.
B
Prong Two. Now assume we got it completely wrong. On the constitutional point (prong one), assume Carpenter gets it right: The officers violated the Fourth Amendment because Carpenter did not resist enough to justify the knee strike or the one-time use of a taser. We would still have to reverse. Accord Concurring Op. at 647-48.
Remember that qualified immunity (as we’ve been reminded again and again) is an “exacting standard” that gives officers lots of leeway, requiring their conduct to violate clearly established law to defeat the defense. City & Cnty. of San Francisco v. Sheehan, — U.S. -, 135 S.Ct. 1765, 1774, 191 L.Ed.2d 856 (2015); see also Taylor v. Barkes, — U.S. -, 135 S.Ct. 2042, 2044, 192 L.Ed.2d 78 (2015). Existing caselaw, in other words, must put the precise question “beyond debate.” Ashcroft v. al-Kidd, 563 U.S. 731, 131 S.Ct. 2074, 2083, 179 L.Ed.2d 1149 (2011). Where’s the clearly established law here? Neither Carpenter nor the district court has an answer.
Carpenter. All Carpenter can muster are the cases cited above — the ones where the suspect either did not resist arrest or had stopped resisting before being tased. E.g., Parker, 547 F.3d at 9, 11. Obviously those cases do not, as they must for Carpenter to prevail, clearly establish the opposite proposition: that the police may not use force on an arrestee who resists arrest. That may be why Carpenter conceded at oral argument that that the police can use force when someone *644 resists arrest, and that this case does not fall within categories of clearly established law. Oral Argument at 20:58-21:33. And even if we created the de minimus exception Carpenter wants, our holding would not overcome the officers’ qualified immunity here; it would apply against individual officers only in future cases.
The district court. The district court wrote that “this case do[es] not fall neatly into the[] categories” of clearly established taser law. R. 32 at 7. That’s a concession that it could find no clearly established constitutional violation, and the court should have stopped there — and held for the defendants. In fact, we have done the same in an excessive-force case that “does not fit cleanly within” our taser case law, Cockrell, 468 Fed.Appx. at 496-98, because qualified immunity operates in the “hazy border between excessive and acceptable force.” Saucier v. Katz, 533 U.S. 194, 206, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001); see Maciariello v. Sumner, 973 F.2d 295, 298. (4th Cir.1992) (“Officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines.”). When in such a haze — as the district court said it was in here — the proper course is to grant summary judgment to the officers, even if the court would hold the officers’ conduct unconstitutional in hindsight. al-Kidd, 131 S.Ct. at 2083; see Brosseau v. Haugen, 543 U.S. 194, 201, 125 S.Ct. 596, 160 L.Ed.2d 583 (2004). The court erred in holding otherwise.
*z3
Carpenter conceded that he resisted arrest. The videos show the same. And the law says that when someone resists arrest, the police may constitutionally use force to ensure their compliance. A jury has nothing left to decide. Because the officers acted constitutionally — and because even if they didn’t, by all accounts they didn’t clearly act unconstitutionally — they are protected by qualified immunity. We reverse.